**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| MEDPACE INC., | : | |
| *Plaintiff*, | : | Case No. 1:24-cv-395 |
| vs. | : | Judge Jeffery P. Hopkins |
| AVM BIOTECHNOLOGY, INC., | : | |
| *Defendant*. | : | |

## OPINION AND ORDER

This case involves a contract dispute between two companies headquartered in different states and arises under the Court's diversity jurisdiction. Plaintiff Medpace, Inc. ("Plaintiff" or "Medpace") is an Ohio corporation which provides services related to the design and execution of clinical development programs involving drugs, biologics, and medical devices. Am. Compl., Doc. 30, ¶ 1. Defendant AVM Biotechnology, Inc. ("Defendant" or "AVM") is a Washington corporation and is in the business of developing or obtaining regulatory approval of the marketing and sale of pharmaceutical products and/or biological products and/or medical devices. *Id.* at ¶ 2. Medpace originally filed a Complaint against AVM claiming a breach of the service agreement the parties had entered. Compl., Doc. 1. AVM filed an Answer and Counterclaim. Doc. 8. Thereafter, Medpace filed an Amended Complaint (Am. Compl., Doc. 30) which prompted AVM to file an Amended Answer to the Amended Complaint and Counterclaim (Doc. 32). This matter is before the Court on Medpace's Partial Motion to Dismiss the Amended Counterclaims asserted by

AVM under Federal Rule of Civil Procedure 12(b)(6) (Doc. 33), AVM's Response (Doc. 34) and Medpace's Reply. Doc. 37.

For the reasons that follow, Medpace Inc.'s Partial Motion to Dismiss (Doc. 33) is **GRANTED** and AVM Biotechnology Inc.'s Amended Counterclaims for false advertising and conversion (Doc. 32) are hereby **DISMISSED WITH PREJUDICE**.

## I.      FACTUAL BACKGROUND

On or about October 25, 2019, Medpace and AVM entered into a Master Services Agreement ("MSA") governing the provision of certain services. Am. Compl., Doc. 30, ¶ 6. Under Section 3 of the MSA, any changes to the details of Task orders were required to be made by written amendment. Babbit Decl., Ex. A, Doc 33-1, PageID 2479. During the course of their relationship, the parties executed four written Task orders, as amended (collectively, the "Task Orders"). Babbitt Decl., Ex. B, Doc. 33–2. Pursuant to Section 4 of the MSA, AVM agreed to compensate Medpace for services in the amounts set forth in the Task Orders, reimburse certain pass-through costs, and pay specified pre-funded expenses. Babbitt Decl., Ex. A., Doc. 33-1, PageID 2480. The MSA further required AVM to remit payment within thirty days of receiving an invoice and to pay interest at a rate of eight percent per annum on amounts outstanding more than fifteen days past the due date. *Id.* at PageID 2480–81.

Medpace alleges that it fully performed its obligations under the MSA and Task Orders and, beginning October 25, 2019, timely invoiced AVM for services rendered, pass-through costs, and pre-funded expenses. Am. Compl., Doc. 30, ¶ 15. According to Medpace, AVM has failed to pay a net amount of $295,588 owed under the agreements. *Id.* ¶ 16. Medpace made written demands for payment on November 16, 2022, February 10, 2023,

August 7, 2023, and December 8, 2023. Despite these demands, AVM has not paid the outstanding balance. *Id.* ¶ 17–18.

## II. PROCEDURAL BACKGROUND

AVM originally filed its Answer and Counterclaim to the original Complaint (Doc. 1) on October 11, 2024. Doc. 8. On February 19, 2025, AVM filed its Answer to the First Amended Complaint (Doc. 30), together with affirmative defenses and a counterclaim, admitting that it had not paid $295,588 invoiced by Medpace but denying that the full amount claimed was due and asserting that Medpace committed prior partial and material breaches of the parties' agreement. Doc. 32. AVM admitted that the MSA and Task Orders constituted an enforceable written contract and that it inadvertently filed the Task orders on the public docket, while denying Medpace's characterization of the documents as confidential under the MSA. Doc. 32, PageID 2395–96. AVM asserted multiple defenses, including failure to state a claim, prior material breach, recoupment and setoff, laches, waiver, estoppel, and unclean hands. *Id.* at PageID 2398–99. AVM also asserted three counter claims against Medpace, including (1) breach of contract based on Medpace's alleged failure to adequately perform clinical trial services; (2) deceptive trade practices under both Ohio and Washington law; and (3) conversion arising from Medpace returning incomplete data to AVM at the conclusion of the study. *Id.* at PageID 2399–2453. Medpace now asks the court to dismiss AVM's Amended Counterclaims for deceptive trade practices and conversion under Fed. R. Civ. P. 12(b)(6). Doc. 33.

### III. STANDARD OF REVIEW

Plaintiff and Counterclaim Defendant Medpace, Inc. seeks to partially dismiss the Amended Counterclaims of Defendant and Counter Claimant AVM Biotechnology, Inc. for failure to state a claim under Rule 12(b)(6).

A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This, however, requires "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Indeed, under the plausibility standard set forth in *Twombly* and *Iqbal*, courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

In deciding a motion to dismiss, the district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007).

4

In doing so, the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000).

## IV.    LAW AND ANALYSIS

### A.  AVM Fails to State a Claim for False Advertising under the ODTPA

Ohio courts analyze ODTPA claims like claims based on Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (the "Act"). *Evanston Ins. Co. v. Certified Steel Stud Ass'n*, 787 F. App'x 879, 885 (6th Cir. 2019). Therefore, "a plaintiff need not prove intent or willfulness to establish a . . . violation." *Id.* Under the ODTPA, the claimant "need only establish an injury that was proximately caused by a person who commits a deceptive trade practice" listed in the Act. *Torrance v. Rom*, 2020-Ohio-3971, ¶ 53 (8th Dist.).

The Lanham Act, in turn, prohibits persons from using a "false or misleading" description or representation of fact in "commercial advertising or promotion" that "misrepresents the nature, characteristics, qualities, or geographic origin" of his or another person's "goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). A civil action is available to "any person who believes that he or she is or is likely to be damaged by" the false advertising. *Id*. § 1125(a)(1). Importantly, "commercial advertising or promotion" implies dissemination to the public. *See Arlington Video Prods. v. Fifth Third Bancorp*, No. 2:08-cv-122, 2008 U.S. Dist. LEXIS 51196, at *10–12 (S.D. Ohio May 1, 2008) (holding that because neither the Lanham Act nor the ODTPA define "advertise," it must be given its ordinary meaning which includes public dissemination and dismissing a deceptive practices claim where the statements were not announced publicly).

It has been observed that the Act on its face "could be read to place no limits on the injured parties who may sue over false advertising." *Lewis v. Acuity Real Est. Servs., LLC*, 63

5

F.4th 1114, 1117 (6th Cir. 2023). "Nearly anyone might claim to have been 'damaged' by a business's false advertising." *Id*. at 1117–18. But courts have confined relief to plaintiffs whose interests "fall within the zone of interests" which the Act protects. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 134 (2014) (quotations omitted).

The Supreme Court in *Lexmark* looked to the Act's stated purpose, as it related to false advertising, in finding that Congress's intent was "to protect persons engaged in [interstate] commerce against unfair competition." *Id*. at 131 (quoting 15 U.S.C. § 1127). This "revealed a narrow goal to protect parties only against 'injuries to business reputation and present and future sales.'" *Lewis*, 63 F.4th at 1118 (quoting *Lexmark*, 572 U.S. at 131). "The Court thus interpreted the zone of interests for false-advertising claims to include only businesses that complain about an 'injury to a commercial interest in reputation or sales.'" *Id*. (quoting *Lexmark*, 572 U.S. at 131–32).

Here, AVM alleges that Medpace personnel misled AVM by falsely representing that Medpace's staff possessed certain abilities, would meet specified deadlines, and would perform (or refrain from performing) certain tasks required under the MSA, and that Medpace wrongfully retained AVM's data and other property by failing to promptly return it as allegedly required by the MSA. Doc. 32, PageID 2448–49. In support of this, AVM presents two arguments. First, AVM alleges that Medpace made a series of generic promotional statements in its marketing materials—such as claims that it achieved "quality results," provided "best-in-class service," delivered "customer satisfaction," and was a "CRO trusted by biotech" and that it "advertised" its relationships with investigators based on language on its website soliciting doctors to join Medpace's investigator network, and further contends that these statements were false in light of Medpace's performance under the MSA. *Id*. at

6

PageID 2406–08. And, second, AVM alleges that, in connection with execution of the MSA and Task Orders and the performance of the related services, Medpace made direct statements to AVM—including purported promises about budgeting, staff involvement, and Medpace's expertise—and that Medpace's contractual warranties and representations in the Agreements themselves were rendered false or misleading by Medpace's failure to perform under those Agreements. *Id.* at PageID 2449.

Crucially, what is missing from AVM's counterclaim is the facts supporting the allegation that Medpace has publicly disseminated false statements, rather than publishing mere puffery or corporate optimism. *See NetJets Aviation, Inc. v. Perlman*, No. 2:22-cv-2417, 2024 U.S. Dist. LEXIS 173552, at *21–23 (S.D. Ohio Sept. 25, 2024). Although the briefing by AVM is prolix and confusing, it alleges that Medpace publicly disseminated the following allegedly false and misleading statements to the public via its website.

> Disciplined Processes. Quality Control. Site Relationships. Technology. *Quality results, hitting timelines, and staying in budget requires excellence in execution. Medpace's ability to deliver year over year can be measured by <u>customer satisfaction and overall service value</u>.* We attribute much of this success to: A disciplined process that delivers quality results, efficiencies, and speed to market.
>
> - *A problem-solving culture fueled by proactive communication*
> - *Deeply embedded relationships with sites* and key opinion leaders
> - A simple-to-use, proprietary clinical trial management system
> - *Full-service project teams including <u>expertise in patient recruiting and study start-up</u>*.

Doc. 32, PageID 2406. And:

> When we can fully engage with our medical, regulatory and operational teams and work under our SOPs, we can perform at the highest levels to deliver quality results *in the most timely and efficient manner*. Competence and empowerment to coordinate all services under one roof provides an accountable, seamless, integrated and efficient platform –increasing quality and speed while significantly reducing a Sponsor's need for duplicate management oversight.

*Id.* at PageID 2406–07. And:

> Our Mission is to accelerate the global development of safe and effective medical therapeutics
>
> Uncompromising Commitment to Research
>
> *Our unique global partnering* philosophy emphasizes an uncompromising commitment to clinical research and to the *highest level of* ethical standards and *performance in our jobs.* We are selective about the projects we engage in because we are devoted to quality and *providing our partners with best-in-class service.*
>
> *Medpace's dedicated teams serve as an extension of your team – we engage quickly and provide strategic thinking – ensuring quicker start-up times, superior quality, and the most efficient delivery of every phase of your clinical trial. Our* therapeutic and regulatory *experts* are committed to streamlining your path to approval so every *partnership* is designed to create research solutions focused on your critical needs.

*Id.* at PageID 2407. And that "Medpace advertised itself as: 'A CRO trusted by biotech' that understands unique challenges of small to medium-sized biopharma companies who are looking to 'partner under a full-service model.'" *Id*. at PageID 2407–08. Finally, AVM also identifies a series of statements Medpace allegedly made while courting AVM's business, including promotional claims about Medpace's expertise in hematology and oncology, its low employee-turnover and continuity of project teams, its ability to select the "best" sites and meet recruitment deadlines, and the capabilities of its ClinTrak and laboratory information systems. *Id.* at PageID 2405–06.

However, these statements amount to mere puffery; consequently, they are not actionable under the Lanham Act or the ODTPA. *See Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) (noting that federal courts often decide whether a representation constitutes a fact or opinion/puffery on a Rule 12(b)(6) motion); *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 699 (6th Cir. 2003) (calling the Mobile Desk "redesigned and improved" is mere puffery which is not

8

actionable under the Lanham Act.). The claims AVM argues are false advertising by Medpace are similar to those in *Gateway Communs., Inc. v. Silicon Valley Fin. Servs.*, No. 00-12869/01-1213, 2002 Bankr. LEXIS 1740, at *31 (Bankr. S.D. Ohio Nov. 20, 2002). Although in the context of negligent misrepresentation, the court treated claims that the defendant was "extremely experienced," "uniquely positioned," guided by values like "respect" and "excellence," had "extraordinary resources," and would "timely perform" in a "professional manner" as nonactionable opinions. *Gateway,* 2002 Bankr. LEXIS 1740, at *31–33. These claims are directly analogous to Medpace's marketing statements.

First, the statements AVM identifies are paradigmatic examples of vague, laudatory marketing language. AVM points to phrases such as "Disciplined Processes. Quality Control. Site Relationships. Technology," "quality results, hitting timelines, and staying in budget requires excellence in execution," "best-in-class service," "customer satisfaction," "perform at the highest levels," "most timely and efficient," "increasing quality and speed," "uncompromising commitment," "devoted to quality," "superior quality," and "the most efficient delivery of every phase of your clinical trial." Doc. 32, PageID 2406–08. These are broad claims of excellence and superiority that do not specify any measurable standard by which they could be proven true or false other than "customer satisfaction and overall service value." *Id.* at PageID 2406.

Second, much of the challenged language is expressly aspirational and framed as mission or philosophy, not as factual guarantees. Medpace's statements that its mission is to "accelerate the global development of safe and effective medical therapeutics," that it has an "uncompromising commitment to clinical research and to the highest level of ethical standards and performance," and that it is "devoted to quality and providing our partners

9

with best-in-class service" are forward-looking, value-laden expressions of corporate goals. Doc. 32, PageID 2407. These statements describe how the company wants to be perceived, not specific, objectively verifiable facts about performance on any particular project.

Third, the more detailed bullet-point descriptions that AVM challenges are still framed at too high a level of generality to be actionable. AVM cites statements that Medpace has "[a] disciplined process that delivers quality results, efficiencies, and speed to market," "[a] problem-solving culture fueled by proactive communication," "deeply embedded relationships with sites and key opinion leaders," "a simple-to-use, proprietary clinical trial management system," and "full-service project teams including expertise in patient recruiting and study start-up," as well as assertions that Medpace's "therapeutic and regulatory experts are committed to streamlining your path to approval" and that it "engage[s] quickly and provide[s] strategic thinking." Doc. 32 PageID 2406–07. These are high-level characterizations of Medpace's processes, culture, and capabilities, not concrete factual assertions about specific outcomes. Without such specificity, they cannot be "literally false" or shown to be misleading in the way the ODTPA requires. *Outdoor Techs. v. Vinyl Visions*, No. 1:06-cv-044, 2006 U.S. Dist. LEXIS 73337, at *8 (S.D. Ohio Sep. 29, 2006) (holding that to state a claim, the plaintiff must show either literal falsity or true but misleading, in which case, it must also prove actual consumer deception).

Fourth, the context of the statements confirms they are puffery. The language appears in general marketing and promotional materials directed to the market as a whole, alongside other branding and corporate messaging, not in the negotiated performance provisions of the MSA or Task orders. *See* Doc. 32, Page ID 2406–08 n. 18, 19,20. Clinical-trial sponsors would reasonably understand these materials as marketing copy and "corporate optimism," not as

binding warranties or empirically verifiable promises about how Medpace would perform under a particular contract. By contrast, the MSA and Task orders contain the specific, enforceable obligations governing Medpace's performance; any concrete misrepresentation theory belongs there, not in generalized advertising slogans.

Accordingly, the statements AVM identifies are generalized, laudatory descriptions of Medpace's quality, capabilities, and corporate philosophy, not concrete, verifiable representations of fact. Because they constitute nonactionable puffery and do not plausibly allege a literally false or misleading statement of fact in commercial advertising or promotion, AVM fails to state a claim for false advertising under the Lanham Act or the ODTPA, therefore, this claim must be dismissed under Rule 12(b)(6).[1]

### B. AVM has Withdrawn its Counterclaim for False Advertising under Washington Law

On April 2, 2026, AVM withdrew its counterclaim asserting a cause of action under Washington law—specifically, its claim under the Washington Consumer Protection Act— leaving that claim no longer before the Court for adjudication. Doc. 34, PageID 2650. Accordingly, the Court need not, and does not, resolve the parties' dispute over whether the Ohio choice-of-law provision contained in the Master Services Agreement MSA governs AVM's state-law counterclaims, at least insofar as that dispute relates to the Washington law claim. AVM's withdrawal of this counterclaim renders moot any choice-of-law analysis that would have been necessary to determine whether Washington or Ohio law supplies the applicable rule of decision for that cause of action.

---

[1] The Amended Answer and Counterclaim does not organize the counterclaims into separately denominated counts as contemplated by Fed. R. Civ. P. 10(b). Accordingly, the Court refers to the counterclaims by subject matter only.

11

### C.  AVM Fails to State a Conversion Claim

Conversion, under Ohio law, is "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 96 (1990). To prove a claim of conversion, it must be shown (1) its right to the possession of the property at the time of conversion; (2) the defendant's conversion by wrongful act; and (3) damages. *Academic Imaging, LLC v. Soterion Corp.,* 352 Fed App'x 59, 67 (6th Cir. 2009) (citation omitted). However, "intent or purpose to do a wrong is not a necessary element of proof to establish conversion." *Fulks v. Fulks*, 95 Ohio App. 515, 518 (1953). However, "the wrongful act alleged must be wrongful for reasons other than a breach of the contract." *Galion Cmty. Hosp. v. Hatford Life & Accident Ins. Co.*, No. 1:08-cv-1635, 2010 U.S. Dist. LEXIS 44757, at *20–21 (N.D Ohio May 7, 2010).

Although prolix, AVM appears to assert a standalone claim for conversion based on Medpace's alleged failure to timely return study data and other materials. Doc. 32, PageID 2421–23, 2451–52.

AVM's conversion theory is indistinguishable from its breach of contract theory. As noted above, in Ohio, "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim," and a conversion claim cannot be based upon property rights that arise entirely from contractual rights. *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). AVM grounds its conversion claim in contractual rights of ownership under the MSA and cites specific MSA provisions governing ownership of, and obligations to transfer, the data. Doc. 32, PageID 2423, 2449–50. Specifically, in support of the conversion claim, AVM cites to the MSA to claim "AVM owned the records [the data] under

MSA § 9, Medpace was a bailee, and Medpace was committing conversion by withholding the records," and that "MSA § 6E merely provided that Medpace had no obligation to perform additional services—it did not expressly provide that Medpace had no obligation to transfer existing data to AVM under the MSA as required under the MSA and existing law. *Id.* at PageID 2421–22. Not only is this argument strained, but it demonstrates the extent to which AVM's conversion claim sounds in contract.

Because AVM's conversion claim rests entirely on contractual rights and obligations created by the MSA and does not allege a separate wrongful act or additional tort damages beyond its contract theory, Ohio law does not permit it to proceed as a standalone tort. *See Wolfe*, 647 F.2d at 710; *Galion*, 2010 U.S. Dist. LEXIS 44757, at *20–21. AVM has no right to possess the data when it admits it did not pay for the Services that generated the data. This is consistent with not only the requisite elements of a conversion claim, but also the plain language of the MSA, which relieves Medpace of any obligation to provide additional Services (including the transfer of data) in the event Medpace terminates the Task Orders for failure to pay. AVM therefore fails to state a claim for conversion, and this counterclaim is dismissed under Rule 12(b)(6).

## V.    CONCLUSION

For the foregoing reasons, Medpace's Partial Motion to Dismiss AVM's Amended Counterclaims (Doc. 33) is **GRANTED**. AVM's counterclaims for deceptive trade practices under Ohio and Washington law and for conversion, as set forth in the Amended Counterclaim (Doc. 32), are **DISMISSED WITH PREJUDICE**. Medpace's claims for breach of contract remain pending.

**IT IS SO ORDERED.**

May 7, 2026 _____

Jeffery P. Hopkins
United States District Judge